**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 25-230** |
| **CHRISTOPHER KNIGHT** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The defendant, Christopher Knight, exploited the authority entrusted to him to inflict punishment on those he knew were powerless to resist. When an inmate allegedly disrespected him, Knight did not follow the disciplinary procedures established by the Philadelphia Department of Prisons. He did not issue a misconduct report, allow the inmate to be heard before a disciplinary board, or wait for the institution to determine an appropriate sanction. Instead, Knight appointed himself judge, jury, and executioner – dispensing immediate punishment on five separate occasions through the use of pepper spray according to his own personal sense of justice. For his crimes, the defendant is deserving of a sentence of 78 months' imprisonment.

A sentencing court follows a two-step process, first calculating the range under the Sentencing Guidelines, and then considering that range along with all pertinent 18 U.S.C. § 3553(a) factors in determining the appropriate sentence. *See* USSG § 1B1.1 (Nov. 1, 2025).[1]

[1] Courts previously followed a three-step process, in which the court first calculated the guideline range, then next ruled on motions for departure, before considering the 3553(a) factors. *See United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006). In an extensive amendment to the Guidelines effective November 1, 2025, the Sentencing Commission eliminated the departure provisions in the manual and dictated the two-step process described above.

At the second step of the sentencing process, "[t]he record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted). *See also Rita v. United States*, 551 U.S. 338, 356 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority."); *United States v. Flores-Mejia*, 759 F.3d 253, 256 (3d Cir. 2014) (en banc) ("Failure to give 'meaningful consideration' to any such argument renders a sentence procedurally unreasonable which, when appealed, generally requires a remand for resentencing.").

The government explains below its view of the proper consideration in this case of the advisory guideline range and of the Section 3553(a) factors supports a sentence of 78 months' imprisonment and a three-year term of supervised release.

## I. BACKGROUND

On March 19, 2026, Christopher Knight pled guilty to an indictment charging him with five counts of deprivation of rights under color of law, in violation of 18 U.S.C. § 242 (Counts 1 and 3 through 6) and falsification of records, in violation of 18 U.S.C. § 1519 (Counts 2 and 7), all arising from his wanton use of pepper spray to inflict punishment on incarcerated persons under his supervision while a sergeant at the Curran-Fromhold Correctional Center in Philadelphia, Pennsylvania. Sentencing is scheduled for July 15, 2026.

## II. CRIMINAL CONDUCT

Counts 1 and 2: January 8, 2023 Victim E.G.

On January 8, 2023, the defendant was working as a sergeant at the Curran-Fromhold Correctional Facility ("CFCF") in Philadelphia, Pennsylvania. The defendant got into an argument with inmate E.G., then ordered E.G. to lie face down on the ground with his hands behind his back. Video shows that E.G. complied with this order, only for the defendant to pepper spray him. When another sergeant started to handcuff E.G., the defendant pepper sprayed E.G. again, even though he was not resisting being handcuffed. Moreover, the defendant sprayed E.G. yet another time after he was fully handcuffed and on the ground.

Following the January 8 attack, the defendant completed a Philadelphia Department of Prisons use of force report. In the report, the defendant intentionally omitted that he sprayed E.G. when he was lying face down on the ground, with his hands behind his back. Moreover, the defendant intentionally omitted that he sprayed E.G. after E.G. was handcuffed, and the defendant falsely stated that he used his spray to gain the compliance of a non-compliant person, even though E.G. was obeying officer commands.

Count 3: January 10, 2023 Victim T.Z.

On January 10, 2023, inmate T.Z. attempted to run away from correctional staff at CFCF. Officer Mark Gee was able to apprehend and handcuff T.Z., at which point he began walking T.Z. down a hallway. Even though T.Z. was handcuffed, compliant, walking calmly down the hall, and obeying Officer Gee's commands, the defendant approached T.Z. and blasted him in the face with pepper spray. Officer Gee was also directly affected by Knight's discharge of pepper spray and instantaneously released T.Z. Officer Gee immediately removed himself from the hallway and went to decontaminate his face.

Count 4: January 10, 2023 Victim R.B.

Later on January 10, 2023, at CFCF, the defendant responded to a housing area where inmates were being ordered to return to their cells. The defendant got into an argument with inmate R.B., who was walking back towards his cell. Although R.B. was following officers' commands, the defendant repeatedly pepper sprayed him as he was returning to his cell. After being sprayed, R.B. was handcuffed and walked to the medical unit. During the walk to medical, the defendant sprayed R.B. again, even though he was subdued, handcuffed, and physically cooperative.

Count 5: March 20, 2023 Victim Q.W.

On March 20, 2023, inmate Q.W. was filling out paperwork at CFCF when he began arguing with the defendant. After exchanging words with the defendant, Q.W. returned to completing a prison form. Video shows that, while Q.W. was writing and looking down, the defendant withdrew his cannister and blasted him in the face with pepper spray. The defendant then sprayed Q.W. three more times, including twice while Q.W. was subdued and on the ground.

Counts 6 and 7: March 24, 2023 Victim Q.O.

On March 24, 2023, inmate Q.O. flooded his cell at CFCF. The defendant obtained three large cans of pepper spray, entered the cell, and sprayed Q.O. After Q.O. fled the cell, officers ordered him to lie face down on the ground, and he obeyed their order. Despite this, the defendant walked up to Q.O. and repeatedly sprayed him. The defendant then filled out his use of force report and intentionally omitted that he sprayed Q.O. when Q.O. was compliant and lying face down on the ground.

In all five attacks, the victims experienced physical pain as a result of being pepper sprayed by the defendant. Moreover, the Federal Bureau of Investigation, an agency of the United States, has jurisdiction over the use of excessive force by prison guards in CFCF and other state and local prisons.

## II. SENTENCING CALCULATION

### A. Statutory Maximum Sentences

Counts 1 and 3-6

The maximum sentence for each violation of Section 242 is a term of imprisonment of 10 years, a term of supervised release of three years, a fine of $250,000, and a special assessment of $100.

Counts 2 and 7

The maximum sentence for each violation of Section 1519 is a term of imprisonment of 20 years, a term of supervised release of three years, a fine of $250,000, and a special assessment of $100.

Total Maximum Sentence

The total permissible statutory maximum sentence is a term of imprisonment of 90 years, a term of supervised release of three years, a fine of $1,750,000, and a special assessment of $700.

### B. Sentencing Guidelines Calculation

The Probation Office correctly calculated the defendant's advisory guideline range is based on an offense level of 30 and a criminal history category of I, resulting in a guideline imprisonment range of 97 months to 121 months. PSR at pp. 8 – 14. Each of the five victims are

grouped separately under USSG § 3D1.2(c). The advisory sentencing guidelines are calculated below:

| **Group 1 (Counts 1 & 2)**<br>**Group 2 (Counts 6 & 7)** | | |
|---|---|---|
| Base Offense Level | USSG § 2A2.2(a) | 14 |
| Dangerous weapon (pepper spray) otherwise used | USSG § 2A2.2(b)(2)(B). | +4 |
| Bodily injury caused to victim | USSG § 2A2.2(b)(3)(A) | +3 |
| Acted under color of law | USSG § 2H1.1(b)(1)(A) and (B) | +6 |
| Obstruction of Justice | USSG § 3C1.1 | +2 |
| | | **29** |

| **Group 2 (Count 3)**<br>**Group 3 (Count 4)**<br>**Group 4 (Count 5)** | | |
|---|---|---|
| Base Offense Level | USSG § 2A2.2(a) | 14 |
| Dangerous weapon (pepper spray) otherwise used | USSG § 2A2.2(b)(2)(B) | +4 |
| Bodily injury caused to victim | USSG § 2A2.2(b)(3)(A) | +3 |
| Acted under color of law | USSG § 2H1.1(b)(1)(A) and (B) | +6 |
| | | 27 |

| | | |
|---|---|---|
| Highest Offense Level | | 29 |
| Combined Offense Level | USSG § 3D1.4 | +4 |
| | | 33 |
| Timely acceptance of responsibility | USSG § 3E1.1 | -3 |
| **Final Offense Level** | | **30** |
| **Criminal History Score** | | **I** |

### C. Knight's Objection to "Dangerous Weapon"[2]

Knight argues that the base offense level should be calculated under the assault guideline in USSG § 2A2.3 and that the four-level enhancement under § 2A2.2(b)(2)(B) does not apply. Both objections rest on the same flawed premise: that pepper spray cannot constitute a "dangerous weapon."

Section 2A2.2 defines aggravated assault to include a felonious assault involving "a dangerous weapon with intent to cause bodily injury." USSG § 2A2.2, comment. (n.1). A dangerous weapon includes an instrument capable of inflicting death or serious bodily injury. USSG § 1B1.1, comment. (n.1(E)). "Serious bodily injury," in turn, includes injury involving "extreme physical pain" or "the protracted impairment of a function of a bodily member, organ, or mental faculty." *Id.* at n.1(L).

The evidence establishes by a preponderance that Knight used pepper spray as a dangerous weapon. Knight repeatedly sprayed directly into the faces of five victims, including victims who

[2] On September 16, 2026, counsel for Knight advised that he withdraws the previously lodged objection to the application of USSG Section 3C1.1 Obstruction of Justice.

were handcuffed or otherwise unable to shield themselves. The resulting injuries demonstrate the spray's capacity to inflict extreme physical pain and bodily impairment. T.Z. reported that his entire face and eyes burned and rated his pain as 10 out of 10. PSR ¶ 20. E.G. experienced difficulty breathing and excessive nasal discharge. *Id.* Q.W. suffered intense burning and temporary loss of vision. *Id.* Victims who had previously experienced pepper spray reported that Knight's targeted use caused a markedly greater level of pain. *Id.* This evidence readily supports both application of Section 2A2.2 and the dangerous-weapon enhancement.

The surveillance footage provides even more compelling evidence as it documents the consequences of Knight's weapon. Video captures Officer Gee's reaction after Knight sprays him directly in the face. Gee immediately loses his ability to see well enough to maintain custody of a T.Z., forcing him to release a prisoner and feel his way through the holding cell for the exit. *See* Gov't Ex. 1 at 1:36. Moreover, the affiant in this case will testify at sentencing that, based on their required exposure to pepper spray during FBI training, the agent knows that pepper spray is painful, causes temporary loss of vision, and, if left untreated, will continue to burn the skin and can damage your eyes.

The law likewise forecloses Knight's categorical contention that pepper spray cannot be a dangerous weapon. Courts have held that pepper spray may qualify as a dangerous weapon when the evidence demonstrates its capacity to inflict the requisite injury. *See United States v. Neill*, 166 F.3d 943, 949–50 (9th Cir. 1999) (affirming pepper spray is dangerous weapon); *United States v. Douglas*, 957 F.3d 602, 606 (5th Cir. 2020) (same); *but see United States v. Harris*, 44 F.3d 1206 (3d Cir. 1995)(gov't failed to meet burden to demonstrate mace was a "dangerous weapon"). In *Neill*, for example, the victim described the effects of pepper spray as making her feel as though she were "on fire" and causing breathing difficulties -- evidence the court found sufficient to

establish its capacity to cause extreme pain and bodily impairment. 166 F.3d at 949–50. Knight's victims described comparable—and in some instances more severe—effects, including 10-out-of-10 pain, breathing difficulty, intense burning, and temporary blindness.

The Third Circuit's holding in *United States v. Harris* does not require a different result. Harris disputed the sentencing enhancement for his use of mace during a bank robbery spree. Harris sprayed mace at a teller while fleeing and, during a second robbery, sprayed it in the air. *Harris*, 44 F. 3d 1209. There, the government failed to establish that the particular mace used was a dangerous weapon because of its argument rested primarily on unreliable documentary evidence, that being a "bulletin" circulated by the mace manufacturer's competitor which suggested the substance had a capacity to cause serious injury. *Id*. at 1215–1216. The competitor's statement conflicted with the manufacturer's own descriptions of its product. *Id.* Here, by contrast, the government does not rely on generalized literature about what pepper spray might do. Nor did the defendant discharge his weapon in the widespread manner as Harris did. Rather, the record establishes what Knight's pepper spray actually did when he deliberately discharged it into his victims' faces: it caused extreme pain, breathing difficulty, and temporary loss of vision. The surveillance footage corroborates those accounts, and the government will present additional testimony from federal agents concerning pepper spray's effects.

The relevant question therefore is not whether every canister of pepper spray is invariably a dangerous weapon. It is whether the pepper spray Knight repeatedly discharged directly into his restrained and defenseless victims' faces was capable of inflicting serious bodily injury. The record establishes that it was. Knight's objections to both § 2A2.2 and the four-level dangerous-weapon enhancement should therefore be overruled.

## III. ANALYSIS

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). "These requirements mean that '[i]n the usual sentencing, . . . the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range." *Peugh v. United States*, 569 U.S. 530, 542 (2013) (quoting *Freeman v. United States*, 564 U.S. 522, 529 (2011) (plurality opinion); ellipsis in original). "Common sense indicates that in general, this system will steer district courts to more within-Guidelines sentences." *Peugh*, 569 U.S. at 543. "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id.* at 544.

In addition, this Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a). The factors relevant to this sentencing are discussed in turn below.

## A. Consideration of the Relevant 3553(a) Factors Regarding Imprisonment

### (1) Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

The nature and circumstances of these offenses strongly support a substantial sentence of imprisonment. Knight did not commit a single lapse in judgment during a chaotic confrontation. Instead, over the course of nearly three months, he repeatedly used a chemical weapon entrusted to him by the Philadelphia Department of Prisons to punish incarcerated individuals who had already been subdued or who posed no threat at all. *See* Gov't Sent. Ex. 1 (Video Compilation). His crimes reveal a pattern of calculated abuse rather than an isolated mistake.

Each assault followed a similar model. Knight waited until the inmate was restrained, compliant, distracted, or otherwise incapable of defending himself before discharging pepper spray directly into the victim's face. He then repeatedly sprayed victims after they had already complied with officer commands, after they had been handcuffed, or while they lay face down on the floor. He transformed a defensive correctional tool into an instrument of punishment.

Particularly aggravating is Knight's choice of weapon and manner of use. As a supervising sergeant, Knight had access to an oversized riot canister designed for extraordinary disturbances. *See* PSR ¶ 20 (Victim R.B. discussion of "blue can" versus red). Rather than reserving that equipment for emergencies, he repeatedly deployed it against individual inmates, intentionally directing the spray into their faces and eyes—the area of the body where it predictably causes the greatest pain and incapacitation. The government's recommended sentence supports the calculated manner in which Knight selected both the weapon and the method of inflicting pain.

Nor were Knight's crimes limited to his immediate victims. His conduct endangered fellow correctional officers, disrupted institutional order, and undermined discipline throughout the facility. During Knight's attack of victim T.Z., Officer Gee himself became contaminated by

Knight's unnecessary use of force, reducing staffing on hand during the shift. Then later on *that same day*, Knight brandished his pepper spray can after victim R.B. had the audacity to move away from Knight. Knight's stalking after R.B. caused other incarcerated individuals to flee from his escalation of behavior. One inmate jumped from a second-floor tier in an apparent effort to avoid the confrontation. Rather than promoting security, Knight's actions created disorder within a correctional institution that depends upon professionalism and restraint.

Knight's personal history likewise provides little mitigation. He was entrusted with increasing responsibility throughout his career and ultimately attained the rank of sergeant. That promotion reflected confidence in his judgment and his ability to lead other correctional officers. Instead, Knight used his supervisory authority to normalize unlawful violence and demonstrate to subordinate officers that retaliation against inmates was acceptable. His position of leadership and his tenure at the prison serves to aggravate—not mitigate—his conduct.

**(2) Seriousness of the Offense, Respect for the Law, and Just Punishment**

The seriousness of Knight's offenses extends beyond the physical injuries inflicted upon his five victims. Color-of-law offenses strike at the legitimacy of government itself. Individuals incarcerated in correctional institutions cannot remove themselves from abusive officials, seek assistance from another authority, or simply walk away. They are entirely dependent upon correctional officers to exercise government power lawfully and professionally.

Knight instead used the authority entrusted to him by the Commonwealth as a license to inflict punishment whenever he believed an inmate had shown him disrespect. He bypassed institutional disciplinary procedures and substituted his own immediate form of corporal

punishment. By repeatedly assaulting restrained and compliant inmates, Knight demonstrated that, in his view, his authority was unconstrained by law.

His subsequent falsification of official reports further demonstrates his disregard for legal accountability. Rather than acknowledging his misconduct, Knight deliberately omitted critical facts and falsely portrayed his victims as noncompliant in an effort to justify unlawful force. Those false reports were not afterthoughts; they were calculated efforts to conceal constitutional violations and frustrate accountability. A substantial sentence is therefore necessary both to punish the assaults themselves and the deliberate abuse of governmental authority that made those assaults possible.

**(3) Deterrence**

General deterrence carries exceptional weight in this case. Unlike many violent crimes, excessive-force offenses committed inside correctional facilities frequently occur outside public view. Victims are incarcerated, often distrustful of law enforcement, and understandably reluctant to report abuse for fear of retaliation. Without meaningful criminal consequences, officers inclined to abuse their authority may believe that constitutional violations committed behind prison walls will never come to light.

A substantial sentence therefore serves an important institutional purpose. It sends a clear message that correctional officers who misuse government authority to inflict unlawful punishment—and who attempt to conceal that misconduct through false official reports—will face serious federal consequences. Equally important, it reassures incarcerated persons, correctional

staff who faithfully perform their duties, and the public at large, that constitutional protections do not end at the prison gate.

Specific deterrence is likewise significant. Knight committed five separate assaults over just three months. He had repeated opportunities to recognize the unlawfulness of his conduct and change course. *See e.g.* Gov't Mot. to Admit Under Rule 404(b), Ex. A (2022 Employee Warning Record reprimanding Knight for using spray on two compliant inmates). Instead, the pattern escalated, demonstrating that lesser consequences or informal correction would not have deterred him. Only a substantial custodial sentence adequately addresses that concern.

A sentence of 78 months also avoids unwarranted sentencing disparities among similarly situated defendants who have admitted to using excessive force under color of law. Such a sentence appropriately reflects the extensive criminal conduct while acknowledging Knight has accepted responsibility for every offense he committed against his victims.

Therefore, in sum, all of the appropriate considerations of sentencing favor the imposition in this case of a sentence of 78 months' imprisonment.

**B. <u>Supervised Release</u>**

Pursuant to Sections 5D1.1 and 5D1.2 of the Sentencing Guidelines, as amended effective November 1, 2025, the Court is directed to conduct an "individualized assessment" when deciding whether to impose a term of supervised release, and if supervised release is imposed, how long the term should be. The Court is further directed to state in open court its reasons for imposing or not imposing a term of supervised release, and its reasons for the length of a term imposed. Further, Section 5D1.3 sets forth mandatory conditions of a term of supervised release, and "discretionary conditions" that the Court may impose, following the same individualized assessment.

The guideline commentary, consistent with 18 U.S.C. § 3583(c), provides that the "individualized assessment" should rest on consideration of the same sentencing factors under 18 U.S.C. § 3553(a) that are considered with respect to a term of imprisonment, with the exception of Sections 3553(a)(2)(A) (the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense") and 3553(a)(3) ("the kinds of sentences available"), which do not apply with regard to supervised release decisions.

In this case, a term of supervised release of three years is warranted to ensure based on the nature of the offenses and characteristics of the defendant. Knight's explanation that workplace stress and frustration motivated his conduct falls short of accounting for his repeated decisions to assault compliant inmates and then falsify official records. The circumstances surrounding his crimes do not show Knight as a solitary correctional officer who resorted to pepper spray out of exasperation, but rather a man who, while flanked by his staff, lashed out on the powerless. Yet Knight reports that he has no need for mental health treatment. His refusal to seek mental-health treatment or meaningfully examine the causes of his conduct supports the need for additional years of supervised release to protect the public.

Close supervision following release from imprisonment is warranted to aid his reentry to society and to protect the public. A term of supervised release in this case advances the goals of sentencing to deter criminal conduct, § 3553(a)(2)(B) and protect the public, § 3553(a)(2)(C). Further, the Sentencing Commission recognizes that "the more serious the defendant's criminal history, the greater the need for supervised release." § 5D1.1 app. note 2. The Commission adds: "In a case in which a defendant sentenced to imprisonment is an abuser of controlled substances or alcohol, it is highly recommended that a term of supervised release also be imposed." § 5D1.1 app. note 3.

This assessment also supports imposition of all of the mandatory and standard conditions of supervised release listed in Section 5D1.3, as well as these additional conditions: mental health evaluation and recommended treatment, no employment in correctional institution or law enforcement, no contact either direct or indirect with the victims of this case.

## IV. CONCLUSION

For these reasons and subject to any that may be presented at the defendant's sentencing hearing and in the Sealed Supplement, the government believes that a significant sentence of 78 months fully accounts for the scope and severity of the defendant's criminal conduct is appropriate in this case.

Respectfully submitted,

DAVID METCALF
United States Attorney

*<u>/s Priya T. De Souza</u>*
PRIYA T. DE SOUZA
MICHAEL MILLER
Assistant United States Attorneys

**CERTIFICATE OF SERVICE**

I hereby certify that this Sentencing Memorandum and Government Sentencing Exhibit 1 has been served on the Filing User identified below through the Electronic Case Filing (ECF) system on counsel of record for Christopher Knight and United States Probation Officer Tricia Donnelly.

*/s Priya T. De Souza*
PRIYA T. DE SOUZA
Assistant United States Attorney

DATED: September 16, 2026.